575 F.2d 774
 Ralph D. FOX, as Administrator of the Estate of Mary Elaine
Fox, Deceased, Plaintiff-Appellee,
v.
FORD MOTOR COMPANY, Defendant-Appellant.
John H. SMITH, as Administrator of the Estate of Diane W.
Smith, Deceased, Plaintiff-Appellee,
v.
FORD MOTOR COMPANY, Defendant-Appellant.
 No. 76-1636.
 United States Court of Appeals,
Tenth Circuit.
 Submitted Sept. 27, 1977.
Decided April 13, 1978.
Rehearing Denied May 9, 1978.
 
 G. L. Spence and Edward P. Moriarity of Spence & Moriarity, Casper, Wyo., and John R. Hursh of Hamilton, Hursh & Crofts, P. C., Riverton, Wyo., for plaintiff-appellee.
 Gordon G. Greiner of Holland & Hart, Denver, Colo. (G. G. Greenlee of Murane, Bostwick, McDaniel, Scott, Greenlee & Owens, Casper, Wyo., on brief), for defendant-appellant.
 Before SETH, Chief Judge, and DOYLE, Circuit Judge, and STANLEY, District Judge.*
 WILLIAM E. DOYLE, Circuit Judge.
 
 I.
 
 1
 The basic question in this case is whether Ford Motor Company is to be held liable for deaths which were caused when a car of its manufacture was struck head-on by a vehicle crossing the center line. The actions were for wrongful death under Wyoming law. The cases were first filed in Wyoming courts and were removed to the United States District Court for Wyoming. Trial was to a jury. It was divided, and after liability for the deaths was established, damage awards were made. The estate of Mary Elaine Fox was awarded $350,000.00 and the estate of Diane W. Smith received $300,000.00.
 
 
 2
 Plaintiffs' theory of the case was that the automobile, a 1970 Thunderbird, was improperly designed. Plaintiffs contended that the rear seats were improperly designed in relationship to the backs of the front seats; that there was a failure to cushion the backs of the front seats in anticipation of an impact causing the passengers to strike their heads against the backs of these seats; that the seat belts were not designed so as to contain passengers against jackknifing forward against the backs of the front seats and so as to protect passengers from suffering lethal internal injuries as a result of being jackknifed forward.
 
 
 3
 Three theories of liability are alleged in the complaint: negligence, strict liability and breach of warranty.
 
 
 4
 The collision occurred on January 20, 1973, on an icy highway at a place 40 miles east of Dubois, Wyoming. A west-bound pickup truck crossed over the center line and struck nearly head-on the east-bound Thunderbird automobile of the decedent and Ralph D. Fox. Other passengers in the car were Diane W. Smith, deceased, and her husband, John H. Smith.
 
 
 5
 All four passengers were wearing seat belts, but not shoulder belts. There were shoulder belts in the front, but not in the back where the two women were riding. The husbands survived, although they were not wearing shoulder belts. The wives in the back suffered similar fatal injuries.
 
 
 6
 The vehicles were not traveling at high speed. Prior to the impact, the Thunderbird had been going 45-50 miles per hour. There was evidence from which the jury could find it had slowed to 30 m. p. h. at the time of the impact. There were indications that the pickup truck which crossed over and collided with the Thunderbird was going at approximately the same speed as the Thunderbird. The evidence was that the damage of the vehicles evidenced a relatively low speed collision.
 
 II.
 
 7
 Mr. Fox drove the Thunderbird. Mr. Smith sat in the passenger seat alongside Fox. The wives sat in the rear seat, Mrs. Fox being in the seat immediately behind her husband and Mrs. Smith occupying the place behind Mr. Smith.
 
 
 8
 Mrs. Fox died shortly after the accident. The autopsy showed severe seat belt damage in the abdominal area above the iliac crest, this being part of the hip bone. The autopsy also showed a fracture of the twelfth thoracic vertebra in addition to the neck fracture and dislocation. Mrs. Fox also was shown to have had a cut in her head and lesions of the brain.
 
 
 9
 Mrs. Smith's spine was fractured in two places. One of these was the same as Mrs. Fox's lower fracture, and she was paralyzed from the waist down after the accident. She had, in addition, internal injuries consisting of broken ribs, ruptures of the small bowel, diaphragm, spleen and lungs. Her intestines had been forced up into her chest area, and she died about two weeks after the accident of a pulmonary embolism which resulted from the injuries.
 
 
 10
 The liability evidence was largely concerned with the alleged defective seat belts. It showed that (as a matter of custom) no domestic auto manufacturer installed rear shoulder belts in 1970 cars. There was also testimony that shoulder belts would have restricted the jackknifing forward movement which the two women had experienced. Also, it would have prevented Mrs. Fox from hitting the seat in front of her. Ford's expert even admitted that it was common knowledge in the industry that a shoulder harness was capable of minimizing abdominal injuries by preventing violent forward movement, and that a three-point or combined shoulder-lap belt was the most effective restraint system.
 
 
 11
 The backs of the front seats were padded high up, but were not padded below. Mrs. Fox's head struck below the padding. There was evidence that Ford had not considered the fact that the padding was not protective of persons of shorter stature. There was also evidence that Mrs. Fox would not have broken her neck had she come into contact with a padded surface. She might, however, have died, according to one expert, from other injuries. Evidence was offered that there were suitable materials for padding the back of the front seat area which is known to be subject to impact. Particularly, this is true because the front seats tend to move forward in a crash. The result is the rear seat passenger strikes at a lower spot.
 
 
 12
 Films of crash tests which Ford carried out were shown. Three involved 1970 Thunderbirds, but these did not have dummies in the rear. There were no such crash tests made on 1970 four-door Thunderbirds with dummies in the rear seat. There was a crash test film for 1967 Fords similar to the 1970 Thunderbird. This did have a seat belted dummy in the rear seat. In this car, however, the front seat was welded in place so that it could not move forward, although it would likely move in a real accident. In that test the dummy jackknifed forward and its head hit the top or the back of the front seat.
 
 
 13
 The main thrust of the plaintiffs' case is directed to the allegedly defective design of the rear seat belts. The complaint is that the hip belts approached being on a horizontal plane rather than on a vertical one which would hold the hips down. The result was that the entire force of the accident was absorbed by the abdomen, a part of the body which is particularly vulnerable. The theory was that if the seat belts had been placed so as to hold the hips down, there would have been preventive force exerted designed to prevent injuries to the lower body. The absence of shoulder belts subjects the upper body to the risk of injury.
 
 
 14
 The women passengers suffered extensive abdominal injuries and fractured spines in substantially the same places. The doctor examining Mrs. Smith testified that her abdominal injuries were caused because the seat belt was worn too high; that if the force had been exerted lower she would have not injured her back or injured her spleen and liver; that the injuries were different from typical seat belt injuries which generally occur at a lower level and are less severe. Another expert witness testified that there was insufficient restraint on the hip area and that the belts were at an improper angle.
 
 
 15
 An expert on behalf of Ford, on the other hand, said that the belts were in the proper position; that the severe injuries were due to the high speed at impact; and that the angle of the belts did not make much difference as far as the nature of the injuries was concerned.
 
 
 16
 From the evidence it would appear that the rear seat belts were anchored to the "floor pan" behind the back seat cushion. They threaded over the seat bottom frame bar and up through the intersection of the seat and back cushions. When this car was made there was a Federal Motor Vehicle Safety Standard No. 209, 32 Fed.Reg. 2415 (2-3-67), which provided:
 
 
 17
 A seat belt assembly shall provide pelvic restraint whether or not upper torso restraint is provided and the pelvic restraint shall be designed to remain on the pelvis under all conditions, including collision. . . .
 
 
 18
 Federal Motor Vehicle Safety Standard No. 210 dealt with the angle of a seat belt in relationship to the person's body as follows:
 
 
 19
 § 4. 3. 1. 2. For installations in which the belt passes through the springs or over the seat frame, . . . the angle between the horizontal and the line of the belt from the occupant's "H" point with the belt snug, but not loaded, shall be as near as practicable to 45 degrees.
 
 
 20
 The "H point" or "seating reference point" is defined as "the mechanically hinged hip point of a manikin which simulates the actual pivot center of the human torso and thigh." 32 Fed.Reg. 2408 (2-3-67).
 
 
 21
 The plaintiff was allowed, over defendant's objection, to present testimony of an investigator who sought to locate the "H points" of women similar in size to the decedents. He then measured the angle from the anchorage (with the seat cushions removed). He calculated an angle of six degrees. The judge permitted this procedure on the basis that the federal standards sought to establish only a minimum standard.
 
 
 22
 There was also evidence offered by plaintiffs to the effect that the belt anchor plates were not installed in accordance with Ford's drawings; that they were out of line and faced the wrong way; that this caused the belt to be higher on the body.
 
 
 23
 Ford's experts testified that the position of the anchorage did not affect the angle of the belt. Their theory was that the angle of the belt was to be measured from the point where it was threaded between the seat back and bottom. They arrived at an angle of 37 degrees using the manikin. Ford offered expert testimony that the position of the anchorage did not affect the angle of the belt. Ford also sought to introduce evidence of the revised version of Standard 210, supra, of the federal regulations. This became effective in 1972. The trial court received Standard 210 in evidence and did so upon the basis that it was evidence of negligence. The court rejected the 1972 modification, 35 Fed.Reg. 15294 (10-1-70), effective in 1972. This reads as follows:
 
 
 24
 In an installation in which the belt bears upon the seat frame, . . . The line from the seating reference point to the nearest belt contact point on the seat frame shall extend forward from that contact point at an angle with the horizontal of not less than 20o and not more than 75o .
 
 
 25
 The trial court considered this as purporting to be an interpretation of the old standard and ruled that it would be conjectural to allow it to be interpreted since the new standard contained no language indicating that it was interpreting the old standard.
 
 
 26
 The official comments about the revision indicate that it was considered a clarification. This comment said:
 
 
 27
 The location of anchorages for Type 1 seat belt assemblies would be clarified . . . At present, the standard requires the angle to be "as near as practicable to 45o ," a formulation which may have caused confusion because of its uncertain parameters. 34 Fed.Reg. 14659 (9-20-69)
 
 
 28
 A later comment states, "the amendments . . . are intended primarily to enhance the enforceability of the standard rather than to provide new levels of safety." 35 Fed.Reg. 18116 (11-26-70).
 
 
 29
 The revision does not change the range of angles too much. Also, it does not serve to give any appreciable clarification. It does, however, favor the defendant's theory to some extent since it refers to the nearest belt contact point, and this would be the point where the belt emerges from between the seat back and the cushion. We are not told whether this would have lessened the hip retention powers of the seat belt. If it diminished hip retention it would be somewhat immaterial whether it was complied with since compliance would not be the same as reasonable prudence.
 
 
 30
 Unquestionably, the particular angle of these seat belts was a significant factor in the production of the injuries. The women were thrown violently forward. They were jackknifed over the seat belts, thereby causing severe abdominal and spinal injuries not ordinarily the result of lap belts. Mrs. Fox struck her head and broke her neck. There was also evidence that their kinds of injuries were foreseeable; that Ford failed to adequately test its cars; even the tests that Ford made revealed that injuries such as were here suffered were likely. Therefore, there is evidence from which a jury could conclude that a shoulder belt or a different angle lap belt could have prevented the deaths, and that padding of the front seat back could have saved Mrs. Fox's life. It is to be noted here, though, that it is less than certain as to whether she would have died from her seat belt injuries.
 
 
 31
 When the cause was argued the principal issue appeared to be whether the trial court erred in submitting strict liability to the jury in view of the fact that Wyoming has not embraced this theory. We have determined, however, that the court did not submit strict liability as a separate theory and that the cause was in effect submitted on a negligence basis and that it is unnecessary for this court to consider whether Wyoming would follow § 402A(2) of the Restatement (Second) of Torts.
 
 III.
 
 32
 The principal contentions of Ford Motor Company in support of its appeal are the following:
 
 It maintains that the court erred:
 
 33
 1. In submitting to the jury the issue of its possible liability for design defects which did not directly cause the injuries and which at most could have been a factor following third parties intervening and causing a collision.
 
 
 34
 2. In submitting to the jury the doctrine of strict liability since it has not been adopted by the Supreme Court of Wyoming.
 
 
 35
 3. In the submission of the issue whether failure to provide shoulder belts in the rear seat of the automobile constituted negligence since there was no evidence that such shoulder belts would have been used had they been provided, and in allowing the jury to consider the lack of energy-absorbing material on the backs of the front seats since there was a lack of evidence to show that Mrs. Fox would not have had her neck broken even if such materials had been furnished.
 
 
 36
 4. In refusing to submit the revision of Standard No. 210 with respect to the required angle of seat belt anchorages.
 
 
 37
 5. In failing to submit special interrogatories to the jury.
 
 
 38
 6. In refusing to instruct the jury that it was at liberty to consider the customs and practices of the industry and in the instructions on breach of warranty and failure to warn.
 
 
 39
 7. In failing to instruct the jury that Ford's liability was limited to those damages which resulted from injuries suffered as a result of defects.
 
 IV.
 
 40
 WAS IT ERROR FOR THE TRIAL COURT TO SUBMIT TO THE JURY THE
 
 
 41
 QUESTION OF FORD'S LIABILITY FOR DESIGN DEFECTS
 
 SINCE THE DEFECTS COMPLAINED OF DID NOT
 BECOME SIGNIFICANT UNTIL THE
 
 42
 COLLISION INTERVENED?
 
 
 43
 Ford's argument is that the manufacturer of automobiles is obligated only to make vehicles which are safe for their ordinary and intended use and that this does not include involvement in collisions. An automobile manufacturer cannot, of course, be expected to produce a car which is foolproof; that is capable of protecting regardless of the force of a collision. If a company has exercised reasonable care in designing and constructing a vehicle, having in mind protection of the passengers, it should not be held liable. Thus, it should be held responsible only for failing to eliminate unreasonable risks of foreseeable injury. See Larsen v. General Motors Corp., 391 F.2d 495 (8th Cir. 1968). This is commonly called the crashworthiness doctrine. In Larsen, the steering mechanism on a Corvair automobile driven by the plaintiff was thrust to the rear into plaintiff's head, causing severe bodily injuries. The court held that the manufacturer was liable, noting that accidents are readily foreseeable in the course of normal use of an automobile. The automobile's function is to furnish safe transportation to the extent reasonably possible under the present state of the art.
 
 
 44
 The opposing view denying liability out of hand was expounded by a divided court in Evans v. General Motors Corp., 359 F.2d 822 (7th Cir.), cert. denied, 385 U.S. 836, 87 S.Ct. 83, 17 L.Ed.2d 70 (1966). General Motors was there charged with failing to build side rails into the frame for the purpose of protecting the driver. The Seventh Circuit rejected the contention that the manufacturer was under a duty to take such measures as were reasonably designed to protect passengers from injuries caused by a collision. The Seventh Circuit said it was for the Indiana Legislature to create such a duty. Ford in this case relies on Evans. Evans was overruled by the Seventh Circuit in Huff v. White Motor Corp., 565 F.2d 104 (7th Cir. 1977).
 
 
 45
 Acceptance of the crashworthiness doctrine has increased since Larsen was announced. The list of authorities includes Smith v. Fiat-Roosevelt Motors, Inc., 556 F.2d 728 (5th Cir. 1977); Huddell v. Levin, 537 F.2d 726 (3d Cir. 1976); Nanda v. Ford Motor Co., 509 F.2d 213 (7th Cir. 1974); Dreisonstok v. Volkswagenwerk, A.G., 489 F.2d 1066 (4th Cir. 1974) (assuming arguendo acceptance of the doctrine); Bremier v. Volkswagen of America, Inc., 340 F.Supp. 949 (D.D.C.1972); Dyson v. General Motors Corp., 298 F.Supp. 1064 (E.D.Pa.1969); Volkswagen of America, Inc. v. Young, 272 Md. 201, 321 A.2d 737 (1974); Rutherford v. Chrysler Motors Corp., 60 Mich.App. 392, 231 N.W.2d 413 (1975); Johnson v. American Motors Corp., 225 N.W.2d 57 (N.D.1974); Baumgardner v. American Motors Corp., 83 Wash.2d 751, 522 P.2d 829 (1974).
 
 
 46
 There are some cases which continue to adhere to the Evans doctrine. These include: McClung v. Ford Motor Co., 472 F.2d 240 (4th Cir.), cert. denied, 412 U.S. 940, 93 S.Ct. 2779, 37 L.Ed.2d 400 (1973); Shumard v. General Motors Corp., 270 F.Supp. 311 (S.D.Ohio 1967); General Motors Corp. v. Howard, 244 So.2d 726 (Miss.1971).
 
 V.
 
 47
 DID THE TRIAL COURT ERR IN HOLDING THAT WYOMING WOULD FOLLOW
 
 
 48
 THE DOCTRINE OF CRASHWORTHINESS?
 
 
 49
 Wyoming law governs us in this case. Thus far the Wyoming court has neither adopted nor rejected the rule of second collision liability. The case of Maxted v. Pacific Car & Foundry Co., 527 P.2d 832 (Wyo.1974), considered whether the failure to place a device in a logging unit, a tractor and trailer, which would allow the driver to sever the trailer or load in the event of an emergency, constituted negligence in design. It there ruled that reasonable foreseeability did not call for such a device; that it was unnecessary even to consider the applicability of the crashworthiness doctrine since the device suggested had never been used or heard of before and was not within the knowledge of the defendant. Similarly, in the case of Wells v. Jeep Corp., 532 P.2d 595 (Wyo.1975), the Wyoming court found it unnecessary to decide the issue.
 
 
 50
 It seems likely that Wyoming would adopt the majority rule if it were called upon to consider this. To follow the repudiated rule of Evans, supra, merely because it involves a second impact brought about by an original collision should not free the manufacturer. The effect of this would be to exempt the manufacturer from liability even if he were negligent.
 
 
 51
 Collisions are not unusual. Indeed they are too common and they pose a foreseeable danger arising out of the intended use of the vehicle. See W. Prosser, Law of Torts 646 (4th ed. 1971). Clearly the function of an automobile is to provide, insofar as reasonable, not merely transportation but safe transportation. The Evans distinction, which says that only injuries directly caused by design defects are compensable, is unjustified. See 80 Harv.L.Rev. 688 (1967).
 
 
 52
 In Maxted, the Wyoming court did describe products liability as a dynamic and expanding field. 527 P.2d 832, 834 (Wyo.1974). Also, Wyoming has shown no tendencies to modify or make exceptions to the general rules surrounding liability for negligence.
 
 VI.
 
 53
 WAS THERE ERROR GROWING OUT OF THE ALLEGED SUBMISSION OF
 
 
 54
 STRICT LIABILITY?
 
 
 55
 One of Ford's contentions is that assuming crashworthiness is adopted, it (Ford) would be liable only if it was shown to have been negligent in designing the vehicle. It maintains that it would not be held strictly liable for design defects under § 402A. It points to the fact that Larsen relied on negligence and found it unnecessary to adopt liability without fault. See 391 F.2d at 503 n.5, 506. There is, of course, authority that strict liability applies in second collision cases. This is a theoretical argument since the trial court's charge in the case at bar made it plain that Ford could be held liable only if it failed to exercise care. Judge Brimmer did not instruct that the manufacturer was to be held liable regardless of whether it exercised all possible care. See § 402A(2)(a).[1]
 
 
 56
 By instructing the jury that the manufacturer is liable to the user if the product is in a defective condition, unreasonably dangerous to the user or consumer and at the same time omitting the proviso in § 402A that the manufacturer of a defective product was liable even if the manufacturer exercised all possible care,[2] the judge left only the standard of negligence for consideration by the jury. The court told the jury that the defendant was not duty-bound to design an accident-proof or foolproof vehicle or a vehicle incapable of producing injury. Three sentences later he instructed that:
 
 
 57
 A manufacturer is liable to a user or consumer of his product first, if the product is in a defective condition, unreasonably dangerous to the user or consumer, and, second, if the defective condition existed at the time the product left the control of the manufacturer, and, third, if such defective condition was the proximate cause of the injuries to the user or consumer.
 
 
 58
 Immediately following this instruction, which Ford contends imposed a standard of strict liability, the jury was told that Ford Motor Company had a duty to use ordinary care in the design of a motor vehicle so as to avoid subjecting the occupants of that vehicle to unreasonable risk of injury in the event of a collision. The negligence standard is enunciated throughout the court's charge. At no time was the jury told that they were to consider strict liability as a basis separate and apart from negligence.
 
 
 59
 It is to be concluded, then, that the charge does not permit a finding of liability without fault. True, it does set forth § 402A plus the first paragraph of subsection (1), but this sounds in negligence in that it provides for liability of one who sells the product in a defective condition unreasonably dangerous to the user or consumer. Taken alone, this is not to be distinguished from the negligence standard since it speaks of defects unreasonably dangerous to the user or consumer. It could become strict liability only if the proviso were included that liability exists, even though the seller has exercised all possible care. Since this part was omitted from the court's charge, this could not be a source of error.
 
 
 60
 Moreover, the trial court correctly described the crashworthiness doctrine in terms of the presence or absence of negligence of the manufacturer. Accordingly, no need whatever exists for determining whether strict liability is the law of Wyoming and, of course, whether it applies in so-called second collision cases.
 
 
 61
 A final factor in deciding whether Wyoming would follow the crashworthinessdoctrine, at least with respect to the standard of negligence, is the fact that the trial judge, having been a member of the Wyoming Bar and a practitioner, is presumed to be in a superior position to predict from the evidence available whether Wyoming would follow the majority or minority doctrine on this subject.
 
 VII.
 
 62
 WERE THE DEFECTS ON WHICH PLAINTIFFS RELY LEGALLY SUFFICIENT
 
 
 63
 TO JUSTIFY SUBMISSION TO THE JURY OF THE ISSUE OF
 
 
 64
 LIABILITY FOR DEFECTIVE DESIGN?
 
 
 65
 Given the fact that Wyoming would probably follow the doctrine that the manufacturer owes a duty to persons using its motor vehicle to take such precautions in its design and manufacture to prevent injuries which can be reasonably foreseen, it remains to be determined whether the evidence in support of submission of the issue to the jury was legally sufficient.
 
 
 66
 In order to determine the reasonableness of the manufacturer's design, it is necessary to weigh, on the one hand, the likelihood of injury should a collision occur, together with the gravity of the injury, if it does occur, against, on the other hand, the costs of the precautions which the manufacturer would have to take in order to avoid the hazard of such injury. See Dreisonstok v. Volkswagenwerk, A.G., 489 F.2d 1066 (4th Cir. 1974); Volkswagen of America, Inc. v. Young, 272 Md. 201, 321 A.2d 737, 746-47 (1974); Noel, Manufacturer's Negligence of Design or Direction for Use of a Product, 71 Yale L.J. 816, 818 (1962). A factor to be weighed is whether the vehicle has been designed to serve a special purpose, which purpose would be undermined if the design were altered. See Dreisonstok, supra, at 1071-75; Dyson v. General Motors Corp., 298 F.Supp. 1064, 1073-74 (E.D.Pa.1969). In Dreisonstok, it was held to be reasonable for the manufacturer to place the driver's seat closer than usual to the front of the vehicle in order to achieve more cargo or passenger space, which was a unique feature of this particular vehicle and which served to attract purchasers.
 
 
 67
 We note, as did the trial court in its charge, that manufacturers need not make a vehicle which is safe for all collisions. Obviously, there is great difficulty in designing and building a vehicle capable of resisting injury in the severe collision. See Huddell v. Levin, 537 F.2d 726, 735 (3d Cir. 1976); Dreisonstok, supra, at 1075. Another important consideration is, as noted, the cost factor. The manufacturer can reasonably be required to make minor and inexpensive changes. The question becomes harder when he is called on to make extensive and costly redesigns of the entire automobile. W. Prosser, Law of Torts 646 (4th ed. 1971).
 
 
 68
 Applying these factors to the alleged defects which are here present, we conclude that neither the absence of shoulder harnesses in the rear passenger compartment, nor lack of energy-absorbing materials in the backs of the front seats, nor the seat belts set at the wrong angle would be either costly or difficult to modify. Nor can it be said that the vehicle which we here consider was designed for a special purpose. The corrections of these defects involve minor and inexpensive changes. There is evidence in the record which would allow the jury to conclude that such changes were capable of saving plaintiffs' lives. It cannot be said that injury was not a foreseeable result of these defects when the car was designed.
 
 
 69
 The defect in the front seat back design is not different in principle from the analysis applied to the seat belts. Illustrative is the case of Smith v. Fiat-Roosevelt Motors, Inc., 556 F.2d 728 (5th Cir. 1977). A car there was rear-ended when it stopped at an intersection. The driver's seat back reclined or broke backward and his back was injured. This was held to be sufficient factual issue to justify denial of summary judgment.
 
 
 70
 Similarly, in Huddell v. Levin, 537 F.2d 726, 735-37 (3d Cir. 1976), it was contended that the head restraints were defectively designed in that there was a sharp edge of unyielding metal. This was a jury question on the issue of defect.
 
 
 71
 An often-cited case is Volkswagen of America, Inc. v. Young, 272 Md. 201, 321 A.2d 737 (1974), in which the seat assembly was unable to withstand rear-end impact. It caused the seat assembly to become separated from the floor. In addition, certain of the structures, surfaces and protrusions in the passenger compartment were said to be defective. The Maryland court held that this was sufficient to constitute a claim.
 
 
 72
 A jury question was found in Rutherford v. Chrysler Motors Corp., 60 Mich.App. 392, 231 N.W.2d 413 (1975). In this case the seat-track assembly tended to disengage as a result of a low-speed impact.
 
 
 73
 The allegation of defective seat belt structure was held to state a valid claim in Baumgardner v. American Motors Corp., 83 Wash.2d 751, 522 P.2d 829 (1974). The seat had come loose and was pushed forward following a collision. At the same time, the seat belt remained fastened. The net result was that the plaintiff's decedent was crushed. In addition, the seat belt could not be opened after the collision.
 
 
 74
 The absence of rear shoulder harnesses is of similar character. Therefore, the jury could find that it created an unreasonable risk of injury.
 
 
 75
 The alleged defects in the case at bar are not dissimilar from those which were dealt with in the above-described cases.
 
 VIII.
 
 76
 DID THE COURT ERR IN REJECTING AMENDED STANDARD 210?
 
 
 77
 There is one element which must be specifically considered. We have called attention to the fact that the trial court instructed the jury that if it found that Ford had violated relevant federal safety standards, such a violation would be evidence of negligence. Ford admitted that the federal standards are not designed to eliminate common law negligence; that they are minimum standards. The standard does not prevent Ford from creating levels of safety which are above and beyond these minimal standards.
 
 
 78
 Federal Motor Vehicle Safety Standard No. 209, incorporating by reference the Department of Commerce's "Standards for Seatbelts for Use in Motor Vehicles," is quoted supra. It emphasizes pelvic restraint which will remain even under collision conditions.
 
 
 79
 Regulation 210 required that the line of the belt from the occupant's "H" point should be as near as practicable to 45 degrees. The "H" point is the "seating reference point." It is defined as "the mechanically hinged hip point of a manikin which simulates the actual pivot center of the human torso and thigh." 32 Fed.Reg. 2408 (2-3-67).[3]
 
 
 80
 Plaintiffs offered evidence using women similar in size to the decedents, resulting in an angle of six degrees. Plaintiffs also offered evidence that the belt anchor plates were not installed in accordance with drawings furnished by Ford.
 
 
 81
 The trial court refused to allow Ford to introduce a revision of Regulation 210, which allowed the angle from the horizontal to be not less than 20o and not more than 75o , measured from the seat belt contact point. The trial judge's ruling that this was conjectural is assigned as error. His reason was that there was no language in the clarification that interpreted the old standard. In any event, the seat belt in question was not designed with reference to the revision. It was promulgated afterwards.
 
 
 82
 There were comments about the revision which indicated some intent to clarify the old standard. There is one thing that it might clarify. It prescribes that the measurement shall be to the nearest belt contact point on the seat frame, and in that way it supports the defendant's contention that the seat belt angle should be measured not from the anchorage, but from the actual line of the belt as it threads between the seat backs and the seat cushion. One trouble that we have is that there is the lack of clarity in the record to show what the difference, if any, would be if it were measured from the anchorage point rather than from the point where the seat cushion and the back cushion come together.
 
 
 83
 Plaintiffs' evidence and the federal regulations as well give great emphasis to the desirability of confining the hip area of the body to the seat cushion. They point out that the gross internal injuries would not have occurred had the point of body restraint been in the lower bony area rather than the mid-section. Although admission of the amended version would certainly have been expedient, it seems likely that it would have made little contribution to the reduction of the total hazardous design of the back seat in relation to the back of the front seat, for it is the sum total of the poor design of this vehicle that produced substantially similar injuries to these two women. First, the front seat back was built with reference to taller people than the decedent women. Secondly, there was no shoulder belt, a device potentially capable of preventing the trunk part of the body from swinging forward. The angle of the lap belt alone would not have prevented the injury to the head inflicted by the lack of padding material on the rear of the front seat backs. A properly angled lap seat belt could have, at most, prevented the gross internal abdominal injuries to both decedents. It could not have prevented the injuries which resulted from the lurching or jackknifing forward. Also, as we view it, the observance of the federal regulation, No. 210, and the modification could not have served as a substitute for acting prudently. This is particularly true of the substitute regulation which had wideranging and vague suggested standards. The trial court could well have determined that it lacked substance and was devoid of probative value. We are not saying that the issue of rejection of the amended Reg. 210 is an easy one. We are saying that the case is not to be reversed on account of the rejection of this amended regulation.
 
 
 84
 Was the evidence sufficient to submit the case? We hold that it was.
 
 
 85
 The evidence concerning the seat belt angle and the federal standards is technical and somewhat complex. However, it is the physical evidence of what the seat belts did to these women and the testimony of the experts with respect to this which is significant. The decedents were thrown violently forward, jackknifing over the seat belts. This caused severe abdominal and spinal injuries not normally inflicted by lap belts. Mrs. Fox struck her head on the metal back of the front seat and broke her neck. There was evidence that these movements were reasonably foreseeable. Moreover, there was evidence that Ford did not adequately test its cars for the safety of rear seat passengers; that the '67 crash test in which they used a rear dummy actually showed that injuries such as those suffered were likely. Therefore, there was evidence from which the jury could have concluded that the shoulder belt or different angle lap belts together with padding on the rear of the front seat backs could have saved Mrs. Fox's life, and the proper seat belt or the shoulder belt could have saved Mrs. Smith's life.
 
 
 86
 The question whether the evidence sufficiently supported the plaintiffs' theory with respect to the shoulder belts needs no further comment. The evidence with respect to the shoulder belt is ample. Ford's contention that there was no showing that they would have used them if they had had them is not persuasive. If Ford had furnished the belt and warned of the danger, it is likely that it would have been used. If the belts had been there and they had not been used, Ford would have a point to argue. Nor need we comment further about the lack of padding on the rear of the front seat backs. We need not expand further on the importance of this latter factor given the failure to provide adequate other protective devices.IX.
 
 
 87
 DID THE TRIAL COURT MISINSTRUCT ON THE QUESTION OF WARRANTY?
 
 
 88
 The trial court's instruction on breach of implied warranty of merchantability said:
 
 
 89
 In the event the jury finds that in the design, assembly or manufacturing processes there was a defect in the automobile of such nature as to cause injury to the occupants in the usual course of the use of said automobile, and should the jury further find that such defect caused the injuries to the decedents in this case, then you may find that said implied warranties were breached . . .
 
 
 90
 The argument of Ford is that this instruction equated a defect with anything which produced injury and thus imposed absolute liability contrary to Wyoming law. They say that there should have been a reasonable balancing type of standard furnished. If the record were not replete with talk of reasonableness and reasonable care, the point now raised would have more appeal. Admittedly, Ford did not object to this instruction on these grounds at trial and thus preserved no issue for appeal as required by Rule 51, F.R.Civ.Proc. Ford now argues that the instruction was so clearly prejudicial and so prone to confuse the jury as to justify this court in treating it as plain and fundamental error. See Taylor v. National Trailer Convoy, Inc., 433 F.2d 569 (10th Cir. 1970).
 
 
 91
 It is quite true that we will review instructions not properly objected to at trial where the error is plain and significant. This power, however, is to be used sparingly. Pridgin v. Wilkinson, 296 F.2d 74 (10th Cir. 1961). Ordinarily we do not exercise it unless it is felt that the error "may well have been a generating factor which culminated in a verdict not warranted under the law," id. at 76, or "where it is apparent on the face of the record that a miscarriage of justice may occur." 5A Moore's Federal Practice, P 51.04.
 
 
 92
 In Maxted v. Pacific Car & Foundry Co., supra, the Wyoming Supreme Court expressed disapproval of an instruction which stated that a manufacturer had a duty to make his product "safe for functional use" because the requirement was only that it be made reasonably safe. The court said that it would be confusing to a jury to submit two different tests of duty.
 
 
 93
 It would appear that the instruction given is subject to question under the standard. The instruction is not to be condemned because part of the difficulty with the Maxted instruction was that it used the vague term "safe for functional use" rather than "reasonably safe." The instruction at bar referred to a defect capable of causing injury to the occupants of an automobile in the usual course of the use of that automobile. Moreover, the Wyoming court was reviewing the trial court's rejection of the instruction in Maxted. It was not exercising authority to reverse for error.
 
 
 94
 In this case the court had instructed extensively on negligence and stated that Ford had no duty to design an "accident-proof or foolproof vehicle." The court had also discussed the liability of the manufacturer whose product "is in a defective condition, unreasonably dangerous to the user or consumer . . ." (emphasis added.) It did not treat warranty as a separate theory any more than it treated the alleged strict liability theory. It blended both of these in with the extensive charge on negligence and reasonableness. On this basis alone our disposition is to not hold that the giving of this instruction was reversible because the jury very probably gave effect to the negligence charge and the accident-proof or foolproof vehicle charge in connection with the warranty, since there was no statement by the court that the warranty was a separate basis for recovery.
 
 X.
 
 95
 DID THE TRIAL COURT ERR IN NOT APPORTIONING DAMAGES BY
 
 INSTRUCTING THE JURY THAT FORD COULD BE HELD
 LIABLE ONLY FOR THOSE DAMAGES WHICH
 PROXIMATELY RESULTED FROM ITS
 
 96
 VIOLATIONS?
 
 
 97
 It is Ford's position that the doctrine of "crashworthiness" renders it liable, if it is to be held liable, only for those defects which enhance the injuries which would have been suffered as a result of the original collision. More important, it contends that the burden is on the plaintiffs to prove in some detail the damages flowing from Ford's violations. Undoubtedly, the position taken is correct to the extent that it limits the manufacturer's liability to the injuries which are the proximate result of the defects. This rule was expounded in Larsen v. General Motors Corp., 391 F.2d 495, 503 (8th Cir. 1968), which said:
 
 
 98
 the manufacturer should be liable for that portion of the damage or injury caused by the defective design over and above the damage or injury that probably would have occurred as a result of the impact or collision absent the defective design.
 
 
 99
 See also Knippen v. Ford Motor Co., 178 U.S.App.D.C. 227, 546 F.2d 993 (1976); Polk v. Ford Motor Co., 529 F.2d 259 (8th Cir.), cert. denied, 426 U.S. 907, 96 S.Ct. 2229, 48 L.Ed.2d 832 (1976) (manufacturer not a joint tort-feasor with other driver); Turcotte v. Ford Motor Co., 494 F.2d 173 (1st Cir. 1974); Dyson v. General Motors Corp., 298 F.Supp. 1064 (E.D.Pa.1969).
 
 
 100
 Generally this duty to prove so-called enhanced damages is simply a part of the plaintiff's responsibility to prove proximate cause, that is, that the defendant in such a case is liable only for those damages which are within the orbit of risk created by him, but Ford would have us say that the plaintiffs were required to prove with specificity the injuries which flowed specifically from its deficiencies.
 
 
 101
 The case which is relied on by Ford to illustrate its position is Huddell v. Levin, 537 F.2d 726 (3d Cir. 1976). There the holding was that plaintiff in a collision case such as the present one had the burden of proving enhanced injuries and that the presentation of evidence that the accident was survivable did not meet this burden. The thesis of this case was that collision cases are to be treated differently from other liability or negligence cases as far as the specificity of proof is concerned. It refused to follow the orthodox doctrines of joint liability of concurrent tort-feasors for injuries which flow from their concurring in one impact.
 
 
 102
 We fail to see any difference between this type of case and the other case in which two parties, one passive, the other active, cooperate in the production of an injury. Each one's contribution in a causal sense must be established. Damages may be apportioned between the two causes if there are distinct harms or a reasonable basis for determining the causes of injury. Restatement of Torts, Second, § 433A.
 
 
 103
 But death is a different matter. It is not a divisible injury in which apportionment is either appropriate or possible. See Restatement, supra, § 433A, comment i; Prosser, Law of Torts 315 (4th ed. 1971). The Huddell court addressed this question by holding that plaintiff could not assert that death was divisible by saying that decedent would not have died but for the defects, and "then assert that it is indivisible in order to deny to General Motors the opportunity of limiting damages." This position, however, fails to recognize that wrongful death is different from cause of action for injuries, which has different elements and a different measure of damages such as pain and suffering.
 
 
 104
 In this case the court instructed the jury that defendant Ford Motor Company was not liable to either of the plaintiffs unless it breached a duty owing to the decedents Mary Elaine Fox and Diane W. Smith, and the breach of that duty was the proximate cause of their deaths. The court also instructed that the proximate cause of an injury is that cause which is natural and continuous, unbroken by an efficient intervening cause, which produces the injury and without which the injury would not have occurred. At another place the court instructed: "In order for you to find that the Defendant breached this duty, you must find that the unreasonable risk of injury was brought about by the defect or defects in the design of a vehicle, and you must further find that such defect or defects, if any, were the proximate cause of the deaths of Mary E. Fox and Diane W. Smith."
 
 
 105
 The elements of damages which the jury was told to consider, presumably under the Wyoming Statute, § 1-1066, were the amount the survivors failed or will fail to receive out of the decedent's earnings, together with any other pecuniary loss directly and proximately sustained by the survivors by reason of such death including funeral expenses and further compensation to the survivors for the loss of the comfort, care, advice and society of the decedent. Thus, the jury was told that in order for the plaintiffs to recover it had to be established by the plaintiffs that the alleged defects were the proximate cause of the deaths for which the action was brought. Moreover, there was evidence in the record that the defects in fact and in law produced the deaths; that had it not been for the defects, the decedents would have survived. In view of the various aspects of the charge and the fact that the suit was for wrongful deaths only, error is not apparent. The damages were apportioned to the extent that it was possible. The court had considered giving an instruction on enhanced damages and there was a good deal of discussion about it. However, the judge finally concluded after hearing the arguments and consulting Larsen, that:
 
 
 106
 to give the instruction as to the apportionment of damages between the defective design and the collision, in view of the bifurcation of this trial, would be unfair.
 
 
 107
 When he instructed the jury he did not give this instruction, and Ford did not object at that time, although it had argued the entire subject previously.
 
 
 108
 A blanket renewal of objections is not effectual. See Dunn v. St. Louis-San Francisco Ry. Co., 370 F.2d 681 (10th Cir. 1966). Moreover, then, the jury had found Ford liable for the deaths and thus there was little basis for contending that apportionment continued to be relevant. There is no evidence in the record, in any event, as to how much damage the collision produced assuming that the decedents survived, but it is not only an impossible question to answer, it is a moot one, since Ford was adjudicated to have caused the deaths which produced the damages for which suit was brought. Since the damages were limited to those allowed under the wrongful death act and Ford was responsible for the deaths and the damages related to the deaths, no apportionment problem remained.
 
 XI.
 
 109
 DID THE TRIAL COURT ERR IN FAILING TO SUBMIT SPECIAL
 
 INTERROGATORIES TO THE JURY, IN FAILING TO
 INSTRUCT ON CUSTOM AND PRACTICE AND IN
 
 110
 INSTRUCTING ON FAILURE TO WARN?
 
 
 111
 A. Special Interrogatories.
 
 
 112
 Admittedly, the decision whether to submit special interrogatories is one with respect to which the trial court has discretion under Rule 49(b), so it is a problem of abuse of discretion. It should be obvious so that it can be said that it was an abuse of discretion. The most that can be said is that special verdicts might have been helpful. It is not a ground for reversal.
 
 
 113
 B. Failure to Instruct on Custom and Practice.
 
 
 114
 The request by Ford was that the trial court instruct that conformity to the custom and usage of an industry by a manufacturer evidenced due care, although the evidence was not conclusive. The judge agreed that custom was a factor which the jury could consider in deciding what a prudent manufacturer would do. However, he apparently felt that the general instructions on negligence and duty would be sufficient.
 
 
 115
 Ford has been unable to cite a case which requires the jury to have a specific instruction on this subject. Again, while it might have been helpful, we do not regard the failure to give the instruction as prejudicial, particularly in view of the fact that the only evidence in the record as to custom was the fact that no other manufacturer installed rear seat shoulder belts.
 
 
 116
 C. Whether There Was a Misinstruction on Failure to Warn.
 
 
 117
 In its charge the trial court said that it was the duty of the manufacturer to make a reasonable effort to apprise occupants of a vehicle of any latent or hidden dangers which were known to it and unknown to the occupants and which would be likely to produce injury in the event of a foreseeable collision. The court went on to say that if the jury found that there was a failure to warn, which conformed to the standards mentioned, it could take this as evidence of negligence. Ford objected generally that this was not the law in Wyoming, an objection which did not meet the specificity requirements of Rule 51.
 
 
 118
 Was it plain error, then, for the court to give an instruction which did not mention unreasonable danger? Since the instruction was geared to evidence of negligence and the thread which ran through the entire charge was that of unreasonable conduct and negligence, it cannot be said that the giving of this instruction with the mentioned omission was plain error.
 
 
 119
 In our opinion, the judgment should be affirmed, and it is so ordered.
 
 
 120
 STANLEY, District Judge, dissenting.
 
 
 121
 I respectfully dissent.
 
 
 122
 This is a diversity case and is controlled by the law of Wyoming. The majority has determined that the case was submitted solely on the basis of negligence and that the federal courts are not called upon to decide whether the Supreme Court of Wyoming, given the opportunity, would adopt the crashworthiness doctrine announced by the Eighth Circuit in Larsen v. General Motors Corp., 391 F.2d 495 (1968).
 
 
 123
 At the trial of the liability issue the jury was instructed
 
 
 124
 A manufacturer is liable to a user or consumer of his product first, if the product is in a defective condition, unreasonably dangerous to the user or consumer, and, second, if the defective condition existed at the time the product left the control of the manufacturer, and, third, if such defective condition was the proximate cause of the injuries to the user or consumer.
 
 
 125
 Ford Motor Company has a duty to use ordinary care in the design of a motor vehicle so as to avoid subjecting the occupants of that vehicle to an unreasonable risk of injury in the event of collision. In order for you to find that the defendant breached this duty, you must find that the unreasonable risk of injury was brought about by the defect or defects in the design of a vehicle, and you must find that such defect or defects, if any, were the proximate cause of the deaths of Mary E. Fox and Diane W. Smith.
 
 
 126
 A clearer statement of the rule in Larsen would be difficult to imagine. The jury was also instructed on common law negligence (defective design) including application of the prudent man standard, and on breach of implied warranty of fitness of the automobile for the purpose for which it was manufactured. The jury was not required to return a special verdict with findings upon each issue of fact as authorized by Rule 49(a), Fed.R.Civ.P., a practice recommended by Chief Judge Brown of the Fifth Circuit "if the Trial Court is uncertain, or the law is in a state of flux, or in a diversity case is yet unrevealed but may well soon be."[1]
 
 
 127
 Under the instructions the trial court introduced concepts of ordinary negligence commingled with those of strict liability. Cf. Eshbach v. W. T. Grant's & Co., 481 F.2d 940 (3d Cir. 1973). In effect, the jury was told that it might find Ford liable on the theory of negligent design or on the theory of breach of implied warranty or under the crashworthiness theory. I could agree that the case was submitted solely on the basis of negligence only by assuming that the jury simply ignored or did not hear that portion of the charge. (The written instructions were not sent to the jury room.) Having only the general verdict on the issue of liability neither the trial court nor this court can have any idea as to whether the verdict was based upon the jury's finding that Ford failed to provide shoulder belts in the rear seat, or improperly located or insufficiently padded the backs of the front seats, or breached its implied warranty of fitness of the automobile for the purpose for which it was manufactured.
 
 
 128
 In reaching the conclusion as to what the Wyoming court would hold the majority noted that the trial court was in a superior position to predict whether Wyoming would follow Larsen or Evans v. General Motors Corp., 359 F.2d 822 (7th Cir. 1966).[2] The rule of deference to a trial court sitting in the state whose law is in question is not absolute, and in any event I am of the opinion that the trial judge's determination was not as to the probable holding of the Wyoming court but rather was an expression of his personal agreement with section 402A of Restatement (Second) of Torts (1971). His statement on this issue was:
 
 
 129
 I have tried to give most of your instructions, not necessarily in the form in which you have submitted them, but in substance. I might say that on the manufacturer's liability 'I've tried to hew the line that the restatement set forth. And that is not the Evans line, but I'm not convinced that the Wyoming Supreme Court has adopted Evans. In fact, I don't think they really have, and I doubt very much in my own opinion that they ever will. I regard this as an area of basically where this court is free to choose.
 
 
 130
 As I have said, the restatement of the position seems most reasonable to me. (R. 738)
 
 
 131
 Neither he nor we are at liberty to choose at will between two conflicting theories of the law in a diversity case in which the state court has not spoken. Hardy Salt Co. v. Southern Pacific Trans. Co., 501 F.2d 1156 (10th Cir. 1974). I agree with Judge Aldisert who, in Huddell v. Levin, 537 F.2d 726, 742 (3d Cir. 1976), a second collision case, said:
 
 
 132
 The common law must accommodate changing conditions, new rights and remedies. New theories of liability, like the second collision theory, require fresh thinking on the part of courts. Whether old precepts are to be retained, or discarded, in second collision cases is a matter that must abide the fermentation of the law in the state court systems. Meanwhile, we of the federal systems are placed in the unhappy position of making predictions, and merely predictions, in these diversity cases, without authority to our conclusions and without the jural responsibilities normally vested in a court system.
 
 
 133
 The Supreme Court of Wyoming not yet having accepted or rejected the crashworthiness doctrine we must examine its opinions, including dicta (Hardy Salt Co. v. Southern Pacific Trans. Co., supra ), in an effort to determine the choice it probably would make.
 
 
 134
 In Maxted v. Pacific Car & Foundry Co., 527 P.2d 832 (Wyo.1974), the Wyoming Supreme Court held that, plaintiff having failed to show a defect, there was no need to decide whether the doctrine of crashworthiness should be adopted. In its discussion the court commented on the well-established rule that the existence or potential existence of a "safer design" is not the issue in a claim of defective design. In affirming the trial court's refusal to give a requested instruction relying on Larsen, the court stated in a footnote that "This case (Larsen ) has not been immune from sharp criticism and judicial disagreement." At another point in mentioning the attempt of appellant to have the court "articulate and recognize certain general propositions in connection with product liability cases in this State", it was stated that recognition would be "particularly inappropriate because of the fact that these are not directly posed nor completely argued and a careless or misunderstood word or phrase might inhibit the orderly and proper growth in this field of the law, which is dynamic and expanding."
 
 
 135
 It is my view that these observations by the Wyoming Supreme Court evidence a very cautious and conservative approach to expansion of the law in the area of product liability. The court's comment that Larsen has been the object of sharp judicial criticism is a telling remark, for Larsen is the forerunner in this new trend in the law. Further, the court refers to Frericks v. General Motors Corp., 20 Md.App. 518, 317 A.2d 494 (1974), as analyzing the criticism of Larsen. In Frericks the Maryland court carefully examined the underlying rationale of the approaches taken in Evans and Larsen, ultimately adopting Evans and held that the extension of manufacturers' liability, as promulgated by the Larsen line of cases, was best left to the legislature stating:
 
 
 136
 We find the basic assumption of Larsen was that liability should be co- extensive with foreseeability and regard that assumption as totally fallacious.
 
 
 137
 and
 
 
 138
 If foreseeability be the sole test, then once liability is extended the logic of the principle would not and could not remain confined.
 
 
 139
 The reference to Frericks by the Wyoming Supreme Court, together with its own comment that Larsen has been subjected to "sharp criticism and judicial disagreement" evidences a measure of dissatisfaction with the rationale of Larsen.
 
 
 140
 I would hold that it was error for the trial court to instruct that Ford would be liable to the decedents under the crashworthiness doctrine announced by Larsen.
 
 
 141
 On the issue of damages, unlike the majority, I would follow the decision of the Third Circuit in Huddell v. Levin, supra. See also Larsen v. General Motors Corp., supra, at 503 and Foland, Enhanced Injury: Problems of Proof in "Second Collision" and "Crashworthy" Cases, 16 Washburn L.J. 600 (1977).
 
 
 142
 In discussing with counsel the instructions he proposed to give at the separate trial on the issue of damages the trial judge originally expressed his intention to charge the jury that
 
 
 143
 Any manufacturer defect which did not cause the accident would not subject the defendant, Ford Motor Company, to liability for the entire damage, . . .
 
 
 144
 but before giving his instructions stated
 
 
 145
 After further reading of the Larson (sic) case it's my conclusion that to give the instruction as to the apportionment of damages between the defective design and the collision, in view of the bifurcation of this trial, would be unfair. For that reason I will not give that instruction.
 
 
 146
 Counsel for Ford had insisted strenuously that the jury should be told that Ford would be liable only for that portion of the damage or injury caused by the defective design over and above the injury attributable to the initial impact. Ford did not object to the instruction after the instructions were given and before the jury retired. Under Rule 51, Fed.R.Civ.P., the giving of the instruction on damages may not now be assigned as error unless plain error is demonstrated. Here, where the issue of enhanced damages had been argued extensively, I would hold that it was plain error, the Supreme Court of Wyoming not having expressed its view, to tell the jury that its verdict should. . . be for a single sum representing the total or aggregate loss suffered by all the survivors of Mary E. Fox, and for a single sum representing the total or aggregate loss suffered by all of the survivors of the decedent, Diane W. Smith.
 
 
 147
 Huddell v. Levin, supra, and see Larsen v. General Motors Corp., supra, at 503 and Foland, Enhanced Injury: Problems of Proof in "Second Collision" and "Crashworthy" Cases, 16 Washburn L.J. 600 (1977).
 
 
 148
 I would reverse and remand for new trial on the issues of liability and damages.
 
 
 
 *
 Of the District of Kansas, sitting by designation
 
 
 [1]
 This subsection which follows the general definition of liability is as follows:
 (1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer * * *
 (2) The rule stated in Subsection (1) (that just described) applies although
 (a) the seller has exercised all possible care in the preparation and sale of his product * * *
 
 
 [2]
 The Restatement, comment a, clearly recognizes that the liability is strict because of this fact:
 a. * * * The rule is one of strict liability, making the seller subject to liability to the user or consumer even though he has exercised all possible care in the preparation and sale of the product. The Section is inserted in the Chapter dealing with the negligence liability of suppliers of chattels, for convenience of reference and comparison with other Sections dealing with negligence. The rule stated here is not exclusive, and does not preclude liability based upon the alternative ground of negligence of the seller, where such negligence can be proved.
 
 
 [3]
 There was some confusion as to whether Ford used the correct manikin in calculating seat belt angles, because the definition of "H point" refers to SAE standards for manikins simulating a 50th percentile adult male, while the definition of "occupant" refers to a person or a 95th percentile adult male. There wasn't really any testimony as to what difference it would make to the angles to use one rather than the other
 
 
 [1]
 "Federal Special Verdicts: The Doubt Eliminator". Paper delivered at the 10th Judicial Circuit Conference 1967. 44 F.R.D. 245, 338. I realize that Rule 49(a) permits but does not require the use of a special verdict and do not suggest that it was error to fail to require the jury to make special findings
 
 
 [2]
 Evans has been overruled by the 7th Circuit. Huff v. White Motor Corp., 565 F.2d 104 (7th Cir. 1977), "In favor of a rule we believe the Indiana Supreme Court would adopt if faced with this case." The 7th Circuit (with three judges on the issue of rehearing favoring certification of the question of state law to the Supreme Court of Indiana) noted that since its decision in Evans the Indiana Court of Appeals had adopted section 402A of the Restatement (Second) of Torts and expressed the belief that that state's Supreme Court would follow the trend in other jurisdictions toward expanded protection of consumers in products liability cases